### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ALLEPICHIAN B. ALDRICH <br> 901 N. Penn Street, Unit R1704 <br> Philadelphia, PA 19123 <br><br> *Plaintiff*, <br><br> v. <br><br> MERRICK B. GARLAND <br> *In his official capacity as the Attorney General of the United States* <br> United States Department of Justice <br> 950 Pennsylvania Avenue NW <br> Washington, DC 20530 <br><br> *Defendant.* | CIVIL ACTION <br><br> No. _____ <br><br> JURY TRIAL DEMANDED |

### CIVIL ACTION COMPLAINT

The above-named Plaintiff, by and through the undersigned counsel, hereby avers as follows:

### I. Introduction

1. Plaintiff, Allepichian B. Aldrich ("Plaintiff"), has initiated the instant action to recover damages for violations of the Americans with Disabilities Act, the Rehabilitation Act, and other applicable law by the United States Department of Justice and the Federal Bureau of Investigation.

2. As detailed herein, the Federal Bureau of Investigation makes little effort to provide accommodations for employees who are wheelchair-bound, and, in this case, drove away an outstanding and highly-talented candidate by subjecting her to disparate treatment due to her use of a wheelchair - and denied her even the basic human necessity of an accessible bathroom while at work.

3. During her tenure as a Forensic Accountant for the Federal Bureau of Investigation, Plaintiff (who is a paraplegic and requires the daily use of a wheelchair) was subjected to

numerous instances of disability discrimination as detailed herein, culminating in her constructive termination on or about July 29, 2022.

## II. Parties

4. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

5. Plaintiff is an adult individual with an address as captioned above.

6. Plaintiff worked as a Forensic Accountant for the Federal Bureau of Investigation from February 27, 2022 until her constructive discharge on July 29, 2022.

7. Defendant Merick B. Garland ("Defendant") is the Attorney General of the United States, having been duly appointed to that office by President Joseph R. Biden in January of 2021 and confirmed by the United States Senate on March 10, 2021.

8. Defendant is named in this action in his official capacity.

## III. Jurisdiction and Venue

9. The foregoing paragraphs are incorporated in their entirety as if set forth in full.

10. The Court may properly maintain personal jurisdiction over Defendant because his contacts with the Commonwealth of Pennsylvania and the Eastern District of Pennsylvania are sufficient for the exercise of such jurisdiction to comply with traditional notions of fair play and substantial justice, satisfying the standard set forth by the United States Supreme Court in *International Shoe Co. v. Washington,* 326 U.S. 310 (1945) and its progeny.

11. The Court may exercise original subject matter jurisdiction over the instant action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4) because it arises under the laws of the United States and seeks redress for violations of rights conferred under Federal law (including the Americans with Disabilities Act and Rehabilitation Act).

12. Venue is properly laid in this judicial district pursuant to 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2) because: (a) Defendant regularly conducts business in this judicial district; and (b) because the acts and omissions giving rise to the claims set forth herein (including

Plaintiff's employment and the adverse employment actions against Plaintiff) occurred in this judicial district.

## IV. Exhaustion of Administrative Remedies

13. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

14. Plaintiff has exhausted the administrative remedies required for proceeding with her claims.

15. Plaintiff completed the Federal EEO process as to her claims, including initiating a timely meeting with an EEO counselor and the filing a timely formal administrative complaint of discrimination on or about October 20, 2022 at No. FBI-2022- 00369.

16. Over 180 days have passed since the filing of the aforesaid complaint, and no decision has been issued by the agency despite a timely request for same.

## V. Factual Background

17. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

18. Prior to joining the FBI, Plaintiff owned and operated an accounting firm, obtained a Certified Fraud Examiner license, and amassed extensive investigative experience in white collar crime cases.

19. Plaintiff entered on duty with the Federal Bureau of Investigation on February 27, 2022 as a Forensic Accountant (FOA) in the FBI's Philadelphia Division.

20. As an FOA, Plaintiff's primary responsibilities included: (a) the conducting of forensic analysis of financial records and the development of financial profiles; (b) the gathering of evidence and the preparation of subpoenas associated with financial analysis; (c) supporting case agents on interviews of subjects and key witnesses; (d) meeting with prosecuting attorneys to discuss strategies and other litigation support functions; and (e) testifying as needed as a fact or expert witnesses in criminal judicial proceedings prosecuted by the United States Department of Justice.

21. During her FBI tenure, Plaintiff worked in the Philadelphia field office, was assigned to

squad OS-2 (Forensic Accountants), and was embedded in Counterintelligence in the Sensitive Compartmented Information Facility ("SCIF") reporting to Supervisory Forensic Accountant (SFOA) Diane Lauricella.

22. Plaintiff has been disabled since September of 2017, when she became a paraplegic, and has required the daily use of a wheelchair since that time.

23. Plaintiff's disability is immediately evident upon meeting her, and became known to the FBI during her application process for a Forensic Accountant position in February 2022.

24. Indeed, the fact that Plaintiff was a paraplegic was denoted by the technician who performed her pre-employment polygraph examination in September 2021.

25. The FBI was fully aware of Plaintiff's disability status prior to making her a final offer.

26. Following her FBI onboarding, the collective actions of the FBI Philadelphia field office and its personnel, and FBI Academy employees, as well as the working conditions she endured at the Philadelphia field office, created a hostile work environment, and revealed a pattern of discriminatory treatment inflicted upon her as a result of her disability.

   a. **The starting salary and bonus discrepancy.**

27. After applying for a Forensic Accountant position with the FBI, Plaintiff received an offer letter which included a starting salary as a GS/12 step 1.

28. Upon receipt of the offer, Plaintiff contacted the FBI's Philadelphia's Human resource department and inquired about the possibility of obtaining a higher starting salary based upon her level of experience.

29. Plaintiff was advised that she had received the highest starting salary offer that could be provided to a civilian.

30. After accepting the FBI's offer and onboarding as a GS/12 step 1, Plaintiff travelled to Quantico, Virginia to attend mandatory FOA training from June 3, 2022, through June 24, 2022.

31. While attending FOA training, Plaintiff learned that the information provided to her by the FBI Philadelphia office about her incoming salary was untrue.

32. Many of Plaintiff's FOA classmates had: (a) received signing bonuses along with their salary offers; and (b) entered the FBI at salaries primarily between GS/12 step 10 and GS/12 step 11 (significantly higher than the offer Plaintiff had been told was the maximum she could receive).

33. In contrast to Plaintiff, many of the FOAs in her class appeared to be recent college graduates with little to no work experience, and most of them did not come to the FBI having already obtained their CFE licenses (as Plaintiff had).

34. Upon obtaining this information about her classmates (while still training at Quantico), Plaintiff contacted her Philadelphia supervisor (Diane Lauricella) and informed her of what she had learned.

35. Lauricella advised that salary negotiations take place prior to an employee's EOD, and that she could not negotiate a change in salary on an employee's behalf.

36. Since Plaintiff had more experience than many of her FOA classmates and was already CFE licensed, the only basis for the discrepancy between her lack of a signing bonus and her lower starting salary compared to the salaries of the other FOAs was discrimination resulting from her evident disability.

   b.  **Plaintiff is told she will never be a special agent due to her disability.**

37. During a meeting with Human Resources (HR) prior to her onboarding, Plaintiff questioned whether she could become a Special Agent if she joined the FBI prior to her reaching the mandatory age limit.

38. Despite the Rehabilitation Act precluding discrimination against hiring an individual based upon physical limitations, Plaintiff was told by an HR representative that she could not become a Special Agent because she was in a wheelchair.

39. Plaintiff was also told that she could never be an agent in the FBI or anywhere else during her attendance at the five-week Forensic Accountants Core Training Session.

40. During the course, former FOAs who successfully made the conversion from FOA to Special Agent were brought in to speak to the class.

41. While it was repeatedly stated that the FOA position was becoming increasingly difficult for the FBI to fill, Plaintiff asked why FOA's who had left the program and converted to agent status were being brought in to address the class because it would likely lead to more attrition at the FOA position.

42. In response to Plaintiff's question, Terry Burke, the head FOA Instructor, stated that she didn't have to worry about it because she would never be an agent in the FBI or anywhere else.

43. Burke's statement was made solely on the basis of discrimination as a result of Plaintiff's disability.

   c.  **Accessibility and other issues during Plaintiff's training.**

44. Plaintiff was informed of her acceptance to attend FACTS class in or around March 2022.

45. In April of 2022, Plaintiff completed a reasonable accommodation (RA) request which initiated discussions regarding the type of accommodations she would need during her training at the FBI's Quantico, Virginia Academy.

46. Plaintiff requested wheelchair-accessible lodging with an accessible bathroom; the ability for her Certified Nursing Assistants to have access to Quantico for pick up and drop off, the interim provision of supplies as needed; and the use of her Bluetooth enabled smart drive on her wheelchair.

47. Per information provided to Plaintiff from the Reasonable Accommodation Program Coordinator (RAPC), Jennifer Gray, arrangements were made for her to reside in a private dorm room on-site in the Quantico Academy's Jefferson Dormitory.

48. The remainder of Plaintiff's class resided at a nearby hotel.

49. The decision to house Plaintiff by herself at the academy was based upon her disability, and resulted in an immediate divide between her and the other FOAs in her class.

50. The FBI had ample time from March 2022 until Plaintiff's scheduled arrival in June 2022 to arrange for wheelchair accessible transportation that would have allowed her to reside at the same location as the rest of her class.

51. During the five-week period when Plaintiff attended FACTS training, there were at least seven occasions when she went without a meal during lunch and/or dinner due to the inability to get to the cafeteria prior to its closing.

52. On those occasions, class would run late, and because Plaintiff's wheelchair-accessible route from class to the cafeteria was extensively longer than the route used by her able-bodied classmates, at times she would be so late getting to the cafeteria that by the time she arrived, many of her classmates would already be finished eating.

53. There were times when class was not released until at or around 6:00 p.m., and the cafeteria closed at either 6:30 or 7:00 p.m.

54. While Plaintiff's classmates had access to other dinner options once they left campus, if Plaintiff was unable to get to the cafeteria, she went without a meal due to the lack of wheelchair-accessible transportation.

55. Plaintiff repeatedly made her Quantico instructors aware of the difficulties she was having regarding getting to the cafeteria, and also spoke with her Philadelphia supervisor (Lauricella) in hopes that she would be able to intervene and help her obtain a resolution.

56. However, there were no accommodations made despite Plaintiff's requests, and she repeatedly struggled to obtain meals.

57. At one point, the primary FACTS instructor, Terry Burke, advised Plaintiff that it was her own fault that the class was being held so far away from other facilities because the normal

classrooms typically used for FACTS were not wheelchair accessible.

58. Burke's statement was discriminatory and solely based upon Plaintiff's disability.

59. Inside each of the classrooms where Plaintiff's FACTS courses were held, there was only one desk located in the front of the room that was wheelchair accessible.

60. As part of the curriculum, each FOA was assigned to a "squad" that included other students from the class.

61. During specified portions of class time, students split up into their squads to complete work on assigned group projects.

62. Because there was only one space where Plaintiff's wheelchair could fit, when her squad worked together, everyone except her sat in a group in the back of the classroom while she remained in the wheelchair-accessible desk in the front.

63. Plaintiff requested that Burke address the seating issue by having her squad sit near her in the front of the room, since she was physically unable to sit near them.

64. Burke advised Plaintiff that he would address the situation, but never did so,

65. Plaintiff was therefore excluded from group participation based on limitations resulting from her disability.

66. During her five week stay at the FBI Academy, Plaintiff also became aware of numerous facility-related issues that affected her ability to fully function independently as a wheelchair user.

67. By way of example, Plaintiff's ability to locate and use wheelchair accessible elevators was a consistent issue, and the majority of the accessible elevators were located in places which required additional travel time to reach her destination on campus.

68. The elevator near the cafeteria routinely stopped at least 2 inches below the floor, which required Plaintiff to "pop a wheelie" in her chair in order to exit the elevator.

69. The elevator near the library also malfunctioned.

8

70. The only doors that seemed to be truly compliant with wheelchair accessibility requirements were the front door to the lobby and the modified door to the shower in the dorm room where Plaintiff resided.

71. Other doors, including the entry doors on either side of the ramps from the courtyard, had gaps that made it very difficult to "pop a wheelie" while also trying to get inside the heavy door at the same time.

72. Due to the entry door not being wide enough, the area that housed the linens was completely inaccessible to Plaintiff as a wheelchair user, forcing her to rely on Quantico's Service Source staff (who were frequently unhelpful) to replace her linens multiple times per week.

73. Another major issue Plaintiff faced was the accessibility of restrooms. While there was at least one wheelchair accessible stall on each floor of the buildings where she attended classes, some of the stalls were only accessible because she had a thin wheelchair that was not the typical size for adults.

74. Additionally, due to an FBI policy related to transgender bathrooms, restrooms that were earmarked for transgender use were only allowed to have one individual in them at a time, even if the restroom contained more than one stall.

75. This policy created a situation where the wheelchair-accessible stalls were frequently unavailable when Plaintiff needed them, and Plaintiff was subsequently forced to travel to other floors to find an available restroom.

76. Moreover, none of the Academy's wheelchair accessible stalls were equipped with sinks inside or near the stall, requiring wheelchair users to touch their wheels with dirty hands to get to the sink, and then clean the wheels of their chair with paper towels so as not to spread germs and bacteria to others outside the bathroom.

77. There were also many elevated thresholds located in the middle of hallway floors, which, while not an impediment to able-bodied individuals, created "speed bumps" that were

difficult for Plaintiff to maneuver in her wheelchair.

### d. **Plaintiff's initial treatment at the Philadelphia office.**

78. After entering on duty at the Philadelphia field office (PFO) on February 27, 2022, on March 3, 2022, Plaintiff was taken by Lauricella to meet Assistant Special Agent in Charge (ASAC) Lillian Perez, who was responsible for overseeing the White Collar Division.

79. When Plaintiff had wheeled herself to within approximately two car lengths of where Perez was standing, Perez turned toward her, bent down and slapped her knees, and greeted Plaintiff as if she was speaking to a puppy or a small toddler.

80. Plaintiff was immediately embarrassed by the way Perez was speaking to her and felt that she was setting a negative example for how others in the office would subsequently greet her.

81. In contrast to Perez's greeting, when Plaintiff met both Lauricella and SAC Maguire for the first time, they each initiated their introductions from far less than two car lengths away, and they both squatted down appropriately to greet her in her wheelchair at eye level and shake her hand.

82. After Plaintiff and Lauricella left the meet and greet, Plaintiff informed Lauricella about her feelings regarding the ASAC's greeting.

83. Lauricella and other co-workers stated that Perez's personality was just "like that," and advised Plaintiff not to address the issue with Perez because she was an ASAC and a member of Executive Management.

84. Although Plaintiff followed their advice, she was no longer comfortable around Perez and she avoided having any additional personal interactions with her.

85. Perez would not have slapped her knees and addressed Plaintiff the way she did if Plaintiff had been an able-bodied person.

    e. **Conditions at the Philadelphia office.**

86. After becoming an employee at the Philadelphia field office, Plaintiff observed that its employee disability accommodations were inadequate.

87. Other than the main entry door utilized by the public, the remaining entry doors were barely wide enough to accommodate a standard size wheelchair and had no automated openers.

88. On multiple occasions (most of which occurred with males), Plaintiff's face was inadvertently and embarrassingly rubbed against an individual's crotch due to their insistence that they hold the narrow, unpowered door open while attempting to assist her.

89. On multiple occasions between March and July 2022, when Plaintiff attempted to perform normal daily functions such as going to get lunch, going to the scanner, or carrying a box of evidence, employees would often make gratuitous comments such as "I know you are trying to be independent but . . . you can let us help you."

90. The only reason people insisted that Plaintiff "needed' to let them help her was her disability.

91. Due to her immuno-compromised status, during the COVID-19 pandemic, Plaintiff wore a mask daily when reporting to the office.

92. Despite ongoing mask requirements, on most days Plaintiff was the only person in her work area who consistently wore a mask, and on several occasions she was told in a confrontational way that she allegedly "did not have to" wear one.

93. One agent in particular, "Amy" (last name unknown, now retired) voiced her opinion and berated Plaintiff about her mask almost every time she saw her.

94. "Amy's" behavior made Plaintiff extremely uncomfortable and created a hostile working environment on a near daily basis.

95. Plaintiff reported "Amy's" behavior to her supervisor multiple times, and Lauricella advised her that she had also reported "Amy's" behavior, but the behavior never changed and "Amy" continued berating Plaintiff.

### f. Accessibility issues at the Philadelphia office.

96. The Philadelphia FBI office, like the FBI Academy, also had numerous wheelchair accessibility issues during Plaintiff's tenure.

97. The "Hirsch pads" utilized to enter the office using an employee badge were initially positioned too high for Plaintiff to reach, and she was therefore was unable to gain access to the building.

98. When several of the pads were finally adjusted so that Plaintiff could reach them, Plaintiff overheard agents complaining about the lower height of the pads.

99. Initially, due to her inability to reach the combination lock for the suite she was assigned to work in, Plaintiff was not able to select her own schedule as other FOA's who were not wheelchair-bound could.

100. The operating pressure on nearly all the entry doors at the office was very heavy and difficult for Plaintiff due to her use of a wheelchair.

101. The scanner/copiers were too high and did not have the ability to adjust height to allow for the top feeder to be more easily managed by wheelchair users.

### g. The restroom accessibility issue.

102. The Philadelphia office had limited access to wheelchair accessible restrooms.

103. This state of affairs created major difficulties for Plaintiff during her tenure, and resulted in her soiling herself on multiple occasions.

104. There were two disability-compliant bathrooms on the 5th Floor, but these were consistently occupied by non-wheelchair users who were looking for a more private place to utilize the restroom facilities.

105. There was one bathroom with an automatic door opener, but it had no wheelchair-accessible stall inside.

106. There was also one very slim bathroom with a ramp, but the threshold was difficult to get

over with small front wheels, and it was unusable by wheelchair-bound individuals.

107. Early in her tenure, Plaintiff would frequently have to travel from the temporary RA building to 600 Arch Street to use the public restrooms on the first floor near the employee entrance because there was usually an open wheelchair assessable stall there.

108. On one particular occasion when she was unable to find an available restroom, Plaintiff started by attempting to access the 5th floor single stall bathroom but found it locked and in use.

109. Plaintiff then moved to the other side of the 5th floor and tried to access the larger bathroom that was equipped with one wheelchair accessible stall, but that wheelchair accessible stall was also occupied.

110. Next, Plaintiff went down to the 3rd floor and found its wheelchair accessible stall to be locked.

111. Plaintiff's next option was the main level, but when she attempted to gain access, it was temporarily blocked due to an incident that had occurred.

112. Reaching a level of urgency, Plaintiff exited the building and went across the street to the main Federal Building. To access the wheelchair ramp, she had to go to the other side of the building, go down the ramp, and then come back across to get to the entry door.

113. By the time she reached the bathroom and attempted to transfer from her chair to the seat, Plaintiff had soiled her clothes.

114. Plaintiff was extremely upset about this incident, and, not being able to secure clean clothing, sat in her wheelchair for the remainder of her workday.

115. After incidents like the foregoing occurred at least two more times, Plaintiff advised Lauricella so that she could try and help her solve the issue of having an available restroom for her to use.

116. Also (as with the sinks at the FBI Academy), the wheelchair accessible stalls in the

Philadelphia office did not have sinks inside or near them, which therefore made it impossible for wheelchair users to clean their hands before touching the wheels of their chair.

117. On or about July 11, 2022, Employee Assistance Program Coordinator Ryan Shapiro set up a meeting between Plaintiff and SAC Maguire so that she could discuss the issues she was experiencing.

118. Prior to the meeting, Plaintiff prepared a list of accommodation requests she had made, events she had experienced, and statements that had been made to her since joining the FBI.

119. During the meeting, Plaintiff discussed each of the foregoing items with SAC Maguire and she advised that she would look into some of the issues and see how she could help.

120. Plaintiff is unaware what, if any, efforts were made to address her requests.

121. On or about July 26, 2022, the FBI Philadelphia office held a disability training session that was available to all employees for either in person and/or via virtual attendance.

122. During her previously-referenced meeting with SAC Maguire, Plaintiff was asked if she would attend the training and provide feedback regarding ways the division could improve.

123. Plaintiff elected to attend the training virtually and logged in from her desk in the SCIF where she sat with the counterintelligence squad she was embedded with.

124. During the training, there were 5-6 wheelchair users who were depicted, each of whom appeared to have intellectual and/or developmental issues (which was a skewed representation of the diversity of wheelchair users).

125. At one point during the training, an elderly woman was depicted revealing all the places it was possible to hide illegal drugs in a wheelchair.

126. After this portion of the training, one of the members of the Counterintelligence squad stood up over the cubicle wall and made a statement similar in nature to "[t]hey should put you down at the training site so that agents could learn how to frisk and search a wheelchair."

127. Plaintiff found the agent's statement to be highly discriminatory and based solely upon her disability.

128. After the foregoing comment was made, Plaintiff was unable to contain her emotions given the issues she had endured as aforesaid, and broke down crying.

129. Plaintiff left the office early and was so emotionally affected by what she had experienced during her FBI employment that she experienced an emotional breakdown and was subsequently hospitalized after attempting to end her life.

130. Plaintiff remained hospitalized through July 29, 2022 and utilized sick leave to remain away from the office.

131. After consulting with her treating physician, on July 29, 2022, Plaintiff's husband informed Lauricella that she would not be returning to the FBI, and Lauricella advised him Plaintiff needed to submit a formal resignation letter (which she did via email later the same day after being discharged from the hospital).

132. The discrimination and hostile work environment harassment she endured from February 2022 through July 2022 while employed with the FBI resulted in Plaintiff's constructive discharge.

133. Had her treatment and experience been different, Plaintiff would still be employed with the FBI today.

134. Following her constructive discharge, Plaintiff elected to continue healthcare benefits through the Consolidated Omnibus Budget Reconciliation Act (COBRA).

135. However, between the dates of August 31, 2022, and November/December 2022, Plaintiff's ability to enroll and initiate COBRA benefits was delayed due to the FBI's failure to timely provide the requisite paperwork.

136. By the time she received the paperwork and was able to complete her enrollment, Plaintiff owed the Federal Healthcare Employment Plan (FHEP) approximately $6,000.00 to cover

the cost of healthcare benefits I had already received, and instead of being able to pay for her benefits one month at a time, I was required to pay the $6,000.00 in previously accumulated benefits at one time.

137. The FBI's failure to send the COBRA paperwork in a timely fashion following Plaintiff's separation was a continuance of its hostile work environment, harassment, retaliation and discrimination against Plaintiff.

### Count One
### Americans With Disabilities Act (ADA) and Rehabilitation Act of 1973
### Disability Discrimination, Harassment and Retaliation

138. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

139. Plaintiff is an individual with a disability as that term is defined in the Rehabilitation Act and a qualified person with a disability as that term is defined in the ADA.

140. By its actions as aforesaid, Defendant has violated the Americans with Disabilities Act (ADA) and the Rehabilitation Act, 29 U.S.C. § 701 *et seq.,* in that it subjected Plaintiff to a hostile work environment based on her aforesaid disability, subjected Plaintiff to disparate treatment because of her disability, failed to provide accessible training and work facilities (including but not limited to classrooms, offices, and restrooms), failed to address Plaintiff's requests for accommodation, and retaliated against Plaintiff because of her disability. WHEREFORE, Plaintiff respectfully requests the relief set forth in the *ad damnum* clause below.

### *AD DAMNUM* CLAUSE

A. That judgment be entered against Defendant on the claims set forth herein;

B. That Plaintiff be awarded actual damages, including lost pay and damages for the pain, suffering, and humiliation caused to Plaintiff by Defendant;

C. That Plaintiff be granted all other legal, equitable or injunctive relief the Court deems

      just and proper;

D.     That Plaintiff is to be awarded the costs and expenses of this action;

E.     That Plaintiff be awarded reasonable attorneys' fees;

F.     That Plaintiff's claims against Defendant be tried to a jury to the extent permitted by applicable law.

                        Respectfully submitted,

                        WAYNE A. ELY

            BY:    /S/   Wayne A. Ely
                        Wayne A. Ely, Esquire
                        Attorney for Plaintiff
                        59 Andrea Drive
                        Richboro, Pennsylvania 18954
                        (215) 801-7979

February 27, 2024